IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA D. LARSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 16-00902-CV-W-ODS |
| | ) | |
| ISLE OF CAPRI CASINOS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>ORDER AND OPINION (1) GRANTING DEFENDANT ISLE OF CAPRI CASINOS, INC.'S
MOTION FOR SUMMARY JUDGMENT, (2) GRANTING IN PART AND DENYING
DEFENDANTS' MOTIONS TO STRIKE, AND (3) GRANTING IN PART AND DENYING IN
PART PLAINTIFF'S MOTION FOR CONDITIONAL AND CLASS CERTIFICATION</u>

Pending are Plaintiff Cynthia Larson's Motion for Conditional and Class

Certification (Doc. #40); Defendants Isle of Capri Casinos, Inc. ("IOC") and IOC-Kansas

City, Inc.'s ("IOC-KC") four Motions to Strike declarations submitted in support of

Plaintiff's Motion for Conditional and Class Certification (Docs. #46, 62, 67, 81); and

IOC's Motion for Summary Judgment (Doc. #48).


I.      PROCEDURAL BACKGROUND

In August 2016, Plaintiff filed this matter on behalf of herself and others similarly

situated, alleging IOC and IOC-KC violated the Fair Labor Standards Act ("FLSA") and

the Missouri Minimum Wage Law ("MMWL"), and IOC and IOC-KC were unjustly

enriched by receiving the benefit of unpaid work.  Doc. #1.  She later amended her

complaint to include additional FLSA and MMWL claims.  Doc. #28.  Plaintiff alleges

Defendants' timekeeping policy did not compensate employees for all time worked

(Counts I and V); Defendants miscalculated the regular hourly rate (Counts II and VI);

Defendants did not properly inform employees of the tip credit policy (Counts III and VII);

Defendants failed to pay employees for required training (Counts IV and VIII); and

Defendants were unjustly enriched by employees' unpaid work (Count IX).

In November 2017, Plaintiff filed a Motion for Conditional and Class Certification

("Motion to Certify").  Doc. #40.  Defendants opposed the Plaintiff's motion, and also filed

a Motion to Strike Plaintiff's Declaration filed in support of her Motion to Certify.  Docs.

#46, 50.  The Motion to Certify and Motion to Strike became fully briefed in January and February 2018, respectively.  Docs. #58, 66.  While the parties briefed those motions, additional motions were filed.

In December 2017, IOC filed a Motion for Summary Judgment arguing IOC was not Plaintiff employer, entitling IOC to summary judgment on all claims.  To allow her an opportunity to conduct discovery on the issue raised in IOC's motion, the Court granted Plaintiff's request to extend her deadline (until April 23, 2018) to respond to IOC's motion. Docs. #52-53, 55-56, 84.  While awaiting a response to the summary judgment motion, Defendants filed Motions to Strike declarations submitted by Chelsea Jaramillo, Brianne Stanford, and Joey Kendall in support of Plaintiff's Motion to Certify.  Docs. #62, 67, 81.[1] These motions became fully briefed in February and April 2018.

Roughly one month after the Motion for Summary Judgment was filed and a ruling was issued on the Motion to Certify, Defendants moved to stay the Court's decision on the Motion to Certify until a decision was issued on IOC's Motion for Summary Judgment. Docs. #72.  The Court granted Defendants' request, finding the issue raised in the summary judgment motion could be dispositive of IOC's liability and may limit collective and class action members.  Doc. #84.[2]  The Court also granted Plaintiff's request for an extension until June 25, 2018, to respond to IOC's summary judgment motion.  *Id.* at 5.

In June 2018, Plaintiff requested an additional forty-five days, until August 9, 2018, to respond to IOC's summary judgment motion.  Doc. #86.  The Court granted Plaintiff's request.  Doc. #87.  Plaintiff then requested yet another extension of time, until September 24, 2018.  Doc. #88.  Plaintiff represented "**no further extensions of this response deadline will be necessary**."  *Id.* at 3 (emphasis in original).  Based on this representation, the Court granted Plaintiff's request, but warned her no additional extensions would be granted "[a]bsent extenuating circumstances."  Doc. #89.

Nevertheless, Plaintiff later sought a seven-day extension of time, until October 1, 2018, to respond to IOC's summary judgment motion.  Doc. #90.  Plaintiff claimed

---

[1] This Order addresses Defendants' Second Motion to Strike Jaramillo's Declaration.  Doc. #81.  Defendants' initial Motion to Strike Jaramillo's Declaration was denied as moot when Plaintiff substituted the declaration with a legible copy.  Docs. #59, 65.

[2] The Court also determined equitable tolling was appropriate, and tolled the statute of limitations for potential putative class members from February 20, 2018, until the Court issues its ruling on IOC's summary judgment motion.  Doc. #84.

additional time was necessary because she was awaiting deposition transcripts, and needed to review the transcripts to finalize her response.  *Id.* at 3.  The Court overruled Defendants' objection (Doc. #92) to the request, granted Plaintiff's request, and declared no further extensions would be granted.  Doc. #93.

On October 1, 2018, Plaintiff filed her response to IOC's summary judgment motion.  Doc. #99.  After obtaining a two-week extension, IOC filed its reply on October 29, 2018.  Docs. #104-05, 108-09.  Finally, IOC's summary judgment motion, filed a year ago, is ripe for consideration.  The Court now considers all pending motions.

## II.    IOC'S MOTION FOR SUMMARY JUDGMENT

### A. Factual Background[3]

Prior to 2017, IOC-KC (a Missouri corporation) was a wholly owned subsidiary of IOC (a Delaware corporation).[4]  Although wholly owned by IOC, IOC-KC had a certificate of incorporation, bylaws, filed annual reports separate from IOC, was responsible for its own financial dealings, maintained its own bank accounts and financial records, and did not commingle funds or assets with IOC.  IOC owned or operated gaming and entertainment facilities in several states.[5]  IOC and each of its subsidiaries shared the same Chief Executive Officer, President, Secretary, and Treasurer.  IOC's corporate office was located in Creve Coeur, Missouri.

From 2013 to 2017, Todd Steffen was the Vice President and General Manager ("VP/GM") of IOC-KC.  As VP/GM, Steffen was the highest ranking employee at IOC-KC. He had authority over IOC-KC's day-to-day operations; was responsible for IOC-KC's financial performance; had the power to hire, discipline, and fire IOC-KC employees; controlled all casino operations; established, revised, and implemented policies and procedures; set the employment conditions of IOC-KC employees; and directed IOC-KC employees in the control of gaming assets.  IOC-KC's Director of Human Resources,

---

[3] Unless otherwise noted, the facts in this section are uncontroverted by the parties.

[4] In May 2017, IOC was acquired by Eldorado Resorts, Inc.  IOC-KC remains a wholly owned subsidiary of IOC, but IOC is now a wholly owned subsidiary of Eldorado Resorts.

[5] In briefing the pending motions, the parties use phrases such as "class period," "all relevant times," "times relevant to this lawsuit," and "time period at issue," but do not identify the specific timeframe.  Unless otherwise stated, the time period discussed throughout this Order is the time Plaintiff was employed (July 2013 to September 2016).

Director of Finance, Guest Experience Manager, Director of Operations, Security Manager, and Senior Director of Marketing reported to Steffen.  Steffen reported to IOC's Senior Vice President of Regional Operations.

Prior to Steffen becoming IOC-KC's VP/GM, IOC entered into an agreement with Steffen wherein he acknowledged he "may perform services for the benefit of or be employed by an affiliate of [IOC]…and agrees that any reference to the Company herein shall be deemed to include any such affiliate…."  Doc. #102-3.  IOC later offered to transfer Steffen to IOC-KC, and allow him to serve as IOC-KC's VP/GM.  Doc. #102-4.  Steffen accepted the offer, agreeing, among other things, he would continue to be entitled to the rights under the agreement he previously executed.  *Id.*  While at IOC-KC, Steffen's compensation was paid by IOC-KC.  Doc. #108-1, at 2.

Plaintiff was employed from June 2013 to September 2016 as a table games dealer and dual-rate supervisor at the "Isle of Capri Casino" in Kansas City, Missouri.  She alleges she was jointly employed by IOC and IOC-KC.

### B. Standard

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986).  "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted).  The Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588-89 (1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir. 1984).  "[A] nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial."  *Nationwide Prop. & Cas. Ins. Co. v. Faircloth*, 845 F.3d 378, 382 (8th Cir. 2016) (citations omitted).

## C.  Discussion

### (1) FLSA and MMWL Claims

To assert an FLSA or MMWL claim against IOC, Plaintiff must establish an employer-employee relationship with IOC.  29 U.S.C. § 216(b) (2018); Mo. Rev. Stat. § 290.505(4) (2006).  IOC contends Plaintiff was employed by IOC-KC only, and thus, IOC is entitled to summary judgment on Plaintiff's claims against IOC.  Plaintiff, however, contends she was jointly employed by IOC and IOC-KC.  Plaintiff bears the burden of proving an employer-employment relationship existed.  *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1360 (8th Cir. 1993).  While the analysis is fact intensive, whether an entity is an employer is a question of law.  *See Berger Transfer & Storage v. Cent. States, Se. & Sw. Areas Pension Fund*, 85 F.3d 1374, 1378 (8th Cir. 1996).

Under the FLSA and MMWL, an employer is a "person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d); Mo. Rev. Stat. § 290.500(4).[6]  A person may be employed by two or more employers at the same time.  29 C.F.R. § 791.2(a).  Whether employment is "joint" or "separate and distinct" depends on "all the facts in the particular case."  *Id.*  A "joint employment relationship" exists when "the employers are not completely disassociated with…the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer."  29 C.F.R. § 791.2(b).[7]

The Eighth Circuit has not established a test for determining whether a joint employer relationship exists under the FLSA, but it has set forth a test to determine whether an entity is an employer under the FLSA.  "[T]he test of employment under the FLSA is one of economic reality."  *Ash v. Anderson Merchandisers, LLC*, 799 F.3d 957, 961 (8th Cir. 2015) (quoting *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985)); *see also Childress v. Ozark Delivery of Mo. LLC*, 95 F. Supp. 3d 1130, 1139 (W.D. Mo. 2015) (citations omitted).  When determining if a joint employer

---

[6] Unless otherwise stated in the statute, the MMWL "shall be interpreted in accordance with the Fair Labor Standards Act."  Mo. Rev. Stat. § 290.050(4).

[7] Plaintiff does not argue the other bases for joint employment – i.e., the employers have an arrangement to share the employee's services, or an employer is acting directly or indirectly in the interest of the other employer in relation to the employee – are applicable.  29 C.F.R. § 791.2(b); Doc. #99, at 76-77.

relationship exists, this Court, several district courts in the Eighth Circuit, and other courts have applied the economic realities test. *See Lochiano v. Compasionate Care, LLC,*[8] No. 10-1089-CV-W-DGK, at *2 (W.D. Mo. Sept. 14, 2012); *Loyd v. Ace Logistics, LLC*, No. 08-0188-CV-W-HFS, 2008 WL 5211022, at *3 (W.D. Mo. Dec. 12, 2008); *In re Enterprise Rent-a-Car Wage & Hour Emp. Practices Litig.*, 783 F.3d 462, 468-71 (3d Cir. 2012); *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998); *Thornton v. Charter Comm'cns, LLC*, No. 4:12CV479, 2014 WL 4794320, at *8 (E.D. Mo. Sept. 25, 2014); *Zachary v. Rescare Okla., Inc.*, 471 F. Supp. 2d 1175, 1179-80 (W.D. Okla. 2006); *Catani v. Chiodi*, No. CIV.00-1559, 2001 WL 920025, at *3 (D. Minn. Aug. 13, 2001).[9] Both parties also utilize this test. Doc. #49, at 1-2, 8-15; Doc. #99, at 76-79, 82-98.

To determine the economic reality of the relationship between an employee and a purported employer, courts consider whether the purported employer (1) had the power to hire and fire employees; (2) supervised and controlled employee's work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *Ash*, 779 F.3d at 961; *Childress*, 95 F. Supp. 3d at 1139; *Baker v. Stone Cty., Mo.*, 41 F. Supp. 2d 979, 980 (W.D. Mo. 1999). These factors are not exhaustive, and "[n]o one factor is dispositive." *Baker*, 41. F. Supp. 2d at 980. As Plaintiff correctly recognizes, "the overarching concern is whether the alleged employer possessed direct or indirect power to control significant aspects of the plaintiff's employment." *Childress*, 95 F. Supp. 3d at 1139; Doc. #99, at 78. The MMWL uses the same test, but Missouri courts also consider if alleged employer's premises and equipment were used for the plaintiff's work. *Tolentino v. Starwood Hotels & Resorts Worldwide, Inc.*, 437 S.W.3d 754, 758 (Mo. banc 2014); *Diaz v. Autozoners, LLC*, 484 S.W.3d 64, 79 (Mo. Ct. App. 2015).

---

[8] Defendant identified itself as Compasionate Care, not Compassionate Care.
[9] When determining if related but distinct entities (i.e., a parent company and its subsidiary) are an integrated enterprise for purposes of Title VII, the Eighth Circuit considered: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 793 (8th Cir. 2009) (citation omitted). Even if the Court were to consider the facts in this matter under the integrated enterprise test, IOC would still be entitled to summary judgment.

### (a) Power to Hire and Fire

IOC sets forth declarations and deposition testimonies from current and former employees of IOC and IOC-KC establishing IOC did not have the power to hire and fire Plaintiff.  Doc. # 49-1, 49-2, 108-1, 108-2, 108-4.  IOC-KC managers had unilateral authority to hire and fire IOC-KC employees.  Doc. #102-3, at 7.  IOC-KC used its own interview process, and IOC was not involved.  Doc. #108-1, at 3.  Nothing in the record indicates IOC-KC had to obtain approval from IOC to hire or fire employees.  Other than IOC-KC's VP/GM, IOC played no role in hiring or firing OC-KC employees.  *Id.* at 4.

Plaintiff directs the Court to other portions of the record in an attempt to establish IOC had the power to hire and fire IOC-KC employees.  Plaintiff first points to the fact that IOC-KC's VP/GM had a contract with IOC, and he reported to IOC.  Plaintiff suggests that, because Steffen had the power to hire and fire IOC-KC employees, IOC (through Steffen) had the power to hire and fire IOC-KC employees.  Plaintiff's argument is an unconvincing attempt to connect the dots.  She neither provides evidence Steffen was acting as an IOC employee while he made hiring and firing decisions, nor points to anything in the record establishing IOC had anything to do with Steffen's (or IOC-KC managers') hiring and firing decisions.  Also, Plaintiff does not set forth legal authority supporting her argument that simply because the subsidiary's top official reports to a parent company, the Court should assume the parent company has the power to hire and fire the subsidiary's employees.

Next, Plaintiff contends IOC had the power to hire and fire because its Senior Director of Human Resources ("SDHR") was involved in subsidiaries' hiring and disciplining.  First, IOC's SDHR once assisted with interviews of general manager candidates for a Mississippi subsidiary, but she "wasn't in the decision making process."  Doc. #102-2, at 15.  Nevertheless, because a general manager is a subsidiary's highest ranking employee, IOC is involved in and makes the decision about who to hire for the position.  Doc. #108-1, at 2.  Second, IOC's SDHR once was involved in investigating and disciplining a general manager at a subsidiary (not IOC-KC).  She was involved because "there's no one above the general manager and so they can't investigate themselves."  Doc. #102-2, at 16.  The subsidiary's employees were also involved in the investigation.  *Id.*  Neither instance establishes IOC had the power to hire or fire Plaintiff.

Plaintiff also notes two instances where IOC-KC's Director of Human Resources contacted IOC's Human Resources Department seeking "guidance" and an "opinion" about potentially disciplining IOC-KC employees.[10]  Setting aside the fact that IOC provided services (such as human resources advice) to its subsidiaries, IOC-KC was not required to obtain approval from IOC to discipline an IOC-KC employee, and IOC-KC did not have to follow IOC's guidance or opinion.

Plaintiff surmises that because IOC fired IOC-KC's VP/GM and Director of Human Resources in 2018 (after Plaintiff was no longer employed), IOC had the power to fire Plaintiff.  But her citations to the record do not explicitly establish IOC made the decision to fire IOC-KC's VP/GM and Director of Human Resources.  The cited record establishes the Director of Human Resources was informed of her termination by an IOC employee, and the Director of Human Resources believed the VP/GM was fired by IOC.  Doc. #102-3, at 5-6.  Even if IOC fired IOC-KC's VP/GM or its Director of Human Resources, that only establishes IOC's power to fire upper-level management, which Plaintiff was not.

Finally, Plaintiff refers to IOC's decision in 2013 to "centralize 80% of the property benefits administration," which resulted in a reduction in force at some IOC subsidiaries. She argues this fact shows IOC had the power to fire IOC-KC employees.  Plaintiff's record citations do not paint a complete picture, and the Court is not obligated "to wade through and search the entire record for some specific facts."  *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 915 (8th Cir. 2007).  Plaintiff does not cite evidence showing, for example, (1) whether IOC's decision caused a reduction in force at IOC-KC, (2) if IOC's decision impacted Plaintiff, (3) whether IOC forced the (unidentified) subsidiaries to eliminate positions, or (4) whether IOC decided the positions to be eliminated.  Thus, the impact of IOC's 2013 decision is unknown, and Plaintiff does not provide the Court with sufficient information to ascertain whether IOC has the power to hire and fire Plaintiff.[11]

---

[10] Plaintiff also refers to the IOC-KC Director of Human Resources seeking "approval from IOC."  Doc. #109, at 10.  While the record clearly reflects the IOC-KC Director of Human Resources asked IOC for guidance and opinions, the Court was unable to find, among Plaintiff's citations to the record, where she sought "approval from IOC."

[11] Plaintiff asserted other arguments to support her contention that IOC had the power to hire and fire IOC-KC employees.  Those other arguments do not show IOC had the power to hire and fire Plaintiff, and will be addressed *infra*.  Plaintiff set forth many of the same arguments for different factors.  The Court's analysis of the argument in the first instance applies to all instances in which Plaintiff makes the same argument.

Plaintiff's citations to the record do not establish IOC had the power to hire or fire her. Additionally, there is no evidence Plaintiff applied for a job with IOC, interviewed with IOC, received an offer of employment from IOC, was hired by IOC, or was discharged by or from IOC. There is no evidence IOC was involved in Plaintiff's hiring or firing. Accordingly, this factor weighs against a finding that IOC was Plaintiff's employer or was a joint employer with IOC-KC.

**(b) Supervised and Controlled Work Schedules or Conditions of Employment**

It is undisputed that IOC did not supervise Plaintiff's day-to-day activities, did not control her work hours or work schedule, and did not determine her job duties. There is no evidence IOC evaluated Plaintiff's job performance. Rather, IOC-KC managers supervised Plaintiff's day-to-day activities, controlled her work hours and work schedule, determined her job duties, and evaluated her performance.

Plaintiff argues "IOC supervised the daily work activities of Plaintiff and other IOC-KC employees through the VP/GM" of IOC-KC. Doc. #99, at 11-12. This argument fails for the same reasons noted above. Further, IOC-KC's VP/GM was not involved in day-to-day scheduling of hourly employees, their job duties, or their job performance. Doc. #108-1, at 4. Also, Plaintiff does not identify legal authority to support her argument that, because the subsidiary's top official reports to a parent company, the parent company automatically supervises and controls the subsidiary's employees.

Plaintiff also highlights IOC's supervision of employees in IOC-KC's Surveillance Department and Compliance Department. But her representation is not entirely accurate. The Missouri Gaming Commission's regulations prohibit the Surveillance Department Manager from directly reporting to anyone at IOC-KC. Doc. #108-2, at 9-13. While the Surveillance Department Manager reported to IOC, the Surveillance Department staff members reported to IOC-KC's Surveillance Department Manager, not IOC. *Id.* While IOC supervised and conducted the performance review of the Surveillance Department Manager, IOC did not supervise or review the performance of Surveillance Department staff members. *Id.* at 11-12. Likewise, IOC-KC's Compliance Officer reported to IOC, but there is no evidence that Compliance Department staff members reported to IOC. *Id.* at 13-14. The unique reporting relationships required for these two positions do not

establish IOC supervised, controlled the work schedules, or set employment conditions for Plaintiff (or other IOC-KC employees).

Plaintiff also points to instances where IOC-KC's Human Resources Department communicated with and sought advice from IOC's Human Resources Department regarding, among other things, bereavement pay, Family and Medical Leave Act, leaves of absence, Americans with Disabilities Act, workers' compensation, personal time off, employee absences, and FLSA. But IOC-KC had its own Human Resources Department, and had no obligation to follow IOC's advice. Providing advice about human resources matters was one of the many services IOC offered its subsidiaries for a fee. Doc. #108-1, at 3; Doc. #41-13, at 4. IOC providing advice to a subsidiary, which the subsidiary did not have to follow, does not demonstrate IOC controlled Plaintiff's conditions of employment.

Next, Plaintiff calls attention to IOC providing a handbook and policies to its subsidiaries. This handbook was another service IOC offered its subsidiaries. Doc. #41-13, at 4. IOC's subsidiaries were not required to use the handbook or policies therein. Doc. #108-2, at 30. IOC-KC used the handbook as a resource for writing and revising IOC-KC's policies. *Id.* at 30-31. Although it adopted some of IOC's policies in their entirety, IOC-KC revised other policies and added roughly twenty-four policies to IOC-KC's handbook that were not in IOC's handbook. *Id.* at 31. IOC-KC implemented these additional policies without seeking input or approval from IOC. *Id.* at 32. Thus, IOC's handbook did not mandate the conditions of Plaintiff's appointment. *See In re Enterprise Rent-a-Car*, 683 F.3d at 471 (noting the parent company suggested policies and practices, but the suggestions were discretionary for the subsidiaries).

Plaintiff contends IOC controlled her employment conditions when IOC's Human Resources Department performed "talent reviews" for ten IOC-KC employees, and distributed "development plans" to them. But these talent reviews involved management employees, and Plaintiff was not a management employee. Doc. #99-13; Doc. #102-3, at 20-21. Furthermore, there is no evidence these talent reviews or development plans affected anyone's employment conditions, much less Plaintiff's.

Plaintiff also touches on an audit conducted in 2015 by IOC of IOC-KC employees on FMLA leave. The audit was to ensure leaves of absence were recorded, and employees on leaves of absence were accredited FMLA hours. While this fact is

uncontroverted by IOC, not much is known about this audit.  It is unclear if the audit was a service provided by IOC, whether IOC-KC requested for the audit, and most significantly, how the audit impacted Plaintiff's employment conditions.

To further support IOC's alleged control over employment conditions, Plaintiff refers to a phone number.  IOC subsidiaries' employees had access to a confidential toll-free phone number operated by a third-party to complain about ethical or legal violations.  If a complaint was made about a subsidiary, IOC notified the relevant subsidiary, and the subsidiary investigated the complaint.  While Plaintiff represents IOC had authority to "take over" a subsidiary's investigation, the record establishes IOC handled investigations into a complaint involving a subsidiary only when "gaming laws and regulations" required them to do so.  Doc. #102-3, at 30-31; Doc. #108-4, at 21.  Regardless, Plaintiff fails to show a parent company providing a confidential toll-free phone number operated a by third-party to subsidiaries constitutes control over the subsidiaries' employees' employment conditions.  She also fails to show IOC's offering of this toll-free number is different than IOC-KC contracting with a third-party for the same service.

Plaintiff also points to training IOC provided to IOC-KC employees on the timekeeping system and the human resources and payroll system, software programs IOC offered to subsidiaries.  IOC's training of its subsidiaries is similar to a timekeeping or payroll system vendor training a customer.  Also, at some unknown time, a member of IOC's Human Resources Department provided "some kind of diversity training" to IOC-KC's employees.  Setting aside that the date and substance of the training is unknown and may not have occurred during Plaintiff's employment, Plaintiff does not demonstrate the training controlled a condition of her employment.  Also, the "diversity" training could have been a training provided by IOC at IOC-KC's cost.

Finally, Plaintiff maintains IOC "handled" IOC-KC employees' benefits, and thus, controlled their employment conditions.  This representation is not entirely accurate.  As yet another service, IOC offered subsidiaries the opportunity to utilize benefits providers with which IOC contracted.  Doc. #41-13, at 4.  Subsidiaries were not required to use benefit providers offered by IOC, and were allowed to select their own benefits providers. *Id.*  IOC's decision to make its benefits offering available to its subsidiaries does not establish control over the employment conditions of IOC-KC employees.

Plaintiff does not cite any evidence to refute IOC's evidence that it did not supervise or determine Plaintiff's employment conditions. Therefore, this factor weighs against a finding that IOC was Plaintiff's employer or was a joint employer with IOC-KC.

### (c) Determined Rate of Pay and Method of Compensation

IOC-KC managers determined Plaintiff's rate of pay. Doc. #108-1, at 5. IOC-KC paid its employees from its bank account via direct deposit or debit card. *Id*. at 4. IOC-KC paid payroll taxes, unemployment insurance, and workers compensation insurance for its employees. *Id.*

Plaintiff asks the Court to consider other facts when analyzing whether IOC determined her rate of pay and method of compensation. Once more, she points to IOC-KC's VP/GM serving as a conduit for IOC to control IOC-KC employees, and therefore, determine IOC-KC employees' rates of pay and methods of compensation. As set forth above, there is no evidence supporting this contention.

Next, Plaintiff refers to IOC-KC seeking "approval from IOC regarding promotion decisions and pay raises" for employees, and IOC had the "final decision" regarding pay. These representations are not entirely accurate. Missouri Gaming Commission regulations prohibited IOC-KC's Surveillance Department Manager from directly reporting to anyone at IOC-KC. Consequently, IOC made decisions as to her pay. There is no evidence that Plaintiff was prohibited from reporting to anyone at IOC-KC, or that IOC determined her pay. Thus, this fact is irrelevant.

Plaintiff directs the Court to IOC's Severance Pay Policy, which applies to all IOC subsidiaries. Doc. #99-20. Notably, the decision to provide severance rests with a subsidiary's general manager. Doc. #102-1, at 21-22. Because the critical decision about whether to provide severance rests with the subsidiary, the Court is hard-pressed to find IOC determined Plaintiff's rate of pay and method of compensation.

Plaintiff argues "IOC set salary ranges for certain positions at IOC-KC." This representation is misleading. IOC-KC's Director of Human Resources contacted IOC's Human Resources Department for "guidance" on salary ranges for three Marketing Department positions. Doc. #99-23; Doc. #102-3, at 33-34. Regardless of IOC-KC choosing to use a service provided to IOC, Plaintiff offers no evidence that IOC-KC had to contact IOC about salary ranges, or IOC-KC had to obtain approval from IOC for salary

ranges. Also, IOC providing salary ranges for three positions in 2015 does not establish it had anything to do with setting Plaintiff's salary range, particularly when she did not work in the Marketing Department. Thus, this fact does not establish IOC determined Plaintiff's rate of pay and method of compensation.

Plaintiff indicates IOC set the length of the pay period for its subsidiaries. But that is not correct. Each subsidiary chose a one-week or two-week payroll cycle. Doc. #102-1, at 23. IOC, which processed payroll, sent payroll processing schedules to subsidiaries. To ensure employees were paid, IOC-KC entered payroll data by IOC's deadline so IOC could process IOC-KC's payroll. IOC processing payroll is similar to a third-party company hired to process a company's payroll. Consequently, IOC had no more control over IOC-KC's payroll processing than a third-party would have.

Plaintiff represents IOC engaged ADP to provide certain services (e.g., IRS forms, wage garnishments, W-2 forms, unemployment tax forms), and ADP provided these services to IOC-KC employees. But what Plaintiff fails to tell the Court is IOC-KC had the choice to use ADP's services. Doc. #108-3, at 36. Again, the control rests with IOC-KC, not IOC. Moreover, it is unclear why ADP's services, which do not pertain to rate of pay or method of compensation, should be considered by the Court.

Next, Plaintiff refers to instances where, generally speaking, IOC provided information to IOC-KC about deduction codes for the payroll system and changes to federal and state wage and hour laws, and provided guidance for complying with federal and state wage and hour laws. IOC providing information about how to use a payroll deduction code is no different than a third-party directing a customer on how to use the third-party's system. Likewise, information about changes in the law – e.g., increased minimum wage – would likely be provided by a third-party hired to process payroll. Finally, IOC's guidance on changes to federal and state wage and hour laws is one of many services offered to subsidiaries. There is no evidence IOC's information or guidance determined Plaintiff's rate of pay or method of compensation.

Plaintiff also highlights IOC's determination as to when its subsidiaries' personal time off ("PTO") rollover would occur. According to IOC's Corporate Payroll Director, IOC set the date and time for the payroll system to perform the "function" of a PTO rollover. Doc. #102-1, at 31-32. Each subsidiary determined its own PTO policy, including when

its PTO rollover would take place.  *Id.*  Thus, IOC's decision as to when to perform a function on the payroll system is inconsequential.

Because a 2016 email to subsidiaries indicated discretionary bonuses would be "calculated" via the payroll system, Plaintiff contends IOC determined her rate of pay and method of compensation.  No evidence is provided explaining the significance of discretionary bonuses being calculated via the payroll system.  Importantly, Plaintiff does not point to anything indicating she received a discretionary bonus, and if she did, she does not establish IOC's role, if any, in determining the discretionary bonus.

Finally, Plaintiff argues her pay stubs indicate IOC determined her rate of pay and method of compensation.  She contends her pays tubs contained the "Isle of Capri Casinos, Inc." logo and do not contain "IOC-Kansas City, Inc."  Doc. #102-31.  The following is a snapshot of a portion of one of Plaintiff's pay stubs:



Pay Date - 1/24/2014  Period End [
01/16/2014



ISLE OF CAPRI CASINO, KANSAS CITY
1800 E. Front Street
Kansas City, MO 64120

"Isle of Capri Casino" (not Isle of Capri Casino*s*), "Isle of Capri Casino, Kansas City," and IOC-KC's address are clear.[12]  To support her contention that IOC's logo appears, Plaintiff points to her pay stubs and the deposition testimony of IOC's Corporate Payroll Director.  Unfortunately, as demonstrated above, the logo appearing at the top of the pay stub is difficult to decipher.  Likewise, the cited deposition testimony does not help because it establishes the following:

> **Question:**   Do you see the name IOC-Kansas City, Inc. anywhere on this pay stub?
> **Answer:**   Not in that spelling, no.

---

[12] While Plaintiff is correct that "IOC-Kansas City, Inc." did not appear on the pay stub, it is disingenuous to make such an assertion without informing the Court that "Isle of Capri Casino, Kansas City" appeared on the pay stub.

Doc. #99, at 73; Doc. #102-1, at 19. Thus, Plaintiff has not presented evidence establishing IOC's name and logo appeared on her pay stubs. Even if she had, Plaintiff does not set forth legal authority supporting her argument that a pay stub containing a parent company's name _and_ the subsidiary's name shows the parent company determined the subsidiary's employee's rate of pay and method of compensation.

Plaintiff does not present evidence that IOC determined (or played any role in determining) her rate of pay and method of compensation. The record demonstrates IOC was essentially a payroll service provider for IOC-KC. *See Conrad v. Waffle House, Inc.*, 351 S.W.3d 813, 822 (Mo. Ct. App. 2011). Thus, this factor weighs against a finding that IOC was Plaintiff's employer or was a joint employer with IOC-KC.[13]

### (d) Maintained Employment Records

IOC-KC set forth evidence that it maintained records of its employees, including personnel files, which were not shared with IOC. To support her argument that IOC maintained employment records of IOC-KC employees, Plaintiff calls attention to (1) IOC's maintenance of a website through which applications for employment with IOC subsidiaries were submitted; (2) IOC's operation of timekeeping, human resources, and payroll systems; (3) the Team Member Access portal; (4) IOC's contract with ADP to provide and handle certain documentation; (5) IOC's operation of a benefits website; (6) IOC's maintenance of 401(k) documentation; and (7) the confidential toll-free number.

Other stating IOC maintained a website where applications for employment with IOC's subsidiaries were submitted, no other information is provided. Presumably, IOC could access the employment applications. But Plaintiff does not provide evidence that IOC actually maintained these applications, or utilized them in any way to make hiring decisions. Indeed, the evidence suggests those decisions were made by IOC-KC.

IOC maintained and had access to a timekeeping system as well as a human resources and payroll system. Both systems were offered to subsidiaries, but they were not required to use them. The timekeeping system contained team member name,

---

[13] Plaintiff also cites to IOC's 2008 audit of IOC-KC's overtime rate calculation, and IOC's 2009 company-wide review of jobs under FLSA. Both took place well before Plaintiff was employed by IOC-KC. Additionally, Plaintiff does not indicate how IOC's audit and review demonstrate IOC determined her rate of pay and method of compensation.

badge number, time clock punch activity, and monetary adjustments entered by the subsidiaries. The human resources and payroll system included team member name, address, position, rate of pay, and deductions, all entered by the subsidiary. IOC keeps timekeeping and payroll data for seven years, and then the data is transferred to a storage company.

The "Team Member Access" self-service portal allowed subsidiaries' employees to view, change, or access personal information, benefits information, pay history, and tax documents. The portal was maintained by IOC through its contract with the human resources and payroll program. Plaintiff, however, does not present evidence that IOC had access to or maintained employees' information contained in the portal.

IOC retained ADP for certain services – i.e., garnishments, tax forms, payroll taxes, unemployment tax forms – and these services were offered to subsidiaries. Doc. #102-1, at 38-39. Plaintiff contends IOC's contract with ADP to provide these functions establishes IOC maintained employment records. But Plaintiff does not show IOC had access to or maintained the records generated or kept by ADP.

IOC provided and maintained a benefits website that allowed subsidiaries' employees to access information about benefits, and view available benefit options. What remains a mystery is whether IOC had access to subsidiaries' employees' information on the website, whether IOC retained the employees' benefits information, and if so, how long the information was retained. Similarly, IOC maintained documentation for IOC-KC employees' 401(k) plans. But what "documentation" was maintained, and how long the documentation was kept by IOC are unknown.

Finally, Plaintiff contends the confidential toll-free number subsidiaries' employees could utilize to report ethical or legal violations establishes IOC maintained employment records. The toll-free number service was provided by a third-party with whom IOC contracted. While reports of the calls were provided to IOC, it is unknown if the records generated by the phone calls were maintained by IOC and/or the third-party.

Plaintiff has established IOC maintained IOC-KC employees' timekeeping records, payroll data, and unidentified documentation related to 401(k) plans. But there is no evidence IOC maintained employment records such as Plaintiff's performance reviews, acknowledgments of policies, disciplinary actions, requests for time off, customer complaints, completion of training programs, job description, personnel file, attendance

record, and documentation related to the end of her employment.  *See Conrad*, 351 S.W.3d at 822.   Overall, this factor – maintaining employment records – leans slightly in favor of finding IOC is not a joint employer.

### (e) Premises and Equipment

As discussed *supra*, the MMWL contains a fifth factor:  premises and equipment used by the employee.   IOC-KC owned all personal property and equipment it used.  IOC-KC purchased the timekeeping system and time clocks utilized by Plaintiff during her employment.  However, Plaintiff argues IOC-KC's use of two software programs establish IOC's systems were used for her work.  IOC acquired and maintained a timekeeping system, and a human resources payroll system.  IOC offered these services to IOC's subsidiaries.  Subsidiaries had a choice to use the programs, or whatever timekeeping or payroll programs they saw fit.  If IOC-KC chose to use a program, it could make changes in that program.  Plaintiff does not set forth evidence as to who controlled the premises on which she worked.  She also does not counter IOC's supported facts that IOC-KC owned all personal property and equipment.  Thus, this factor weighs against a finding that IOC was a joint employer of Plaintiff.  *See Conrad*, 351 S.W.3d at 822-23.

### (f)  Acknowledgment as Employer

Plaintiff asks the Court to consider one additional factor:  IOC acknowledged it was her employer.  Doc. #99, at 79.  A case from this Court – *Childress v. Ozark Delivery of Missouri LLC* – is the sole support for her argument.  But Plaintiff's reliance on *Childress* is misplaced.  In *Childress*, the purported joint employers (Ozark and Advantage) "expressly acknowledged that they were entering into a joint employer agreement, and that [Advantage] will enter into a written agreement with each employee recognizing [Advantage's] role as a joint employer."  95 F. Supp. 3d at 1144.  Advantage also sent "new hire documents to Plaintiffs indicating…Plaintiffs were entering into an employment relationship with Advantage…."  *Id.*  Unlike *Childress*, IOC and IOC-KC did not agree to be joint employers.  No document recognizes IOC as a joint employer of Plaintiff, and IOC did not send documentation to her about an employment relationship.

Plaintiff argues IOC acknowledged it was her employer in the following ways:

- Plaintiff signed a checklist during IOC-KC's new hire orientation, which indicated the orientation was "sponsored by" IOC.

- IOC-KC employees received an "Alcohol Policy Guideline" stating "The Isle of Capri Casino Inc. takes the service of alcohol as a serious responsibility." Plaintiff fails to point out that IOC (which is Isle of Capri Casinos Inc.) is not mentioned in the policy, and IOC-KC's logo appears at the top of the policy.

- IOC-KC employees were provided some of IOC's policies: Disabled Guest Policy, Agreement to Confidentiality, Social Medial Policy, and Handbook Addendum – Family and Medical Leave Act. IOC-KC employees agreed to comply with these policies. Similarly, Plaintiff acknowledged she received a copy of the IOC handbook, and agreed to abide by the policies therein. IOC's name and logo appear at the bottom of the acknowledgement form. But, as set forth above, IOC-KC could, but was not required to, use IOC's policies.

- Plaintiff signed an acknowledgment of receiving IOC's handbook. IOC's name and logo appear at the bottom of the form. The handbook indicates it is a guide for the employment relationship, but provides only general information and guidelines. The recipient is referred to as "part of the Isle of Capri Casinos, Inc.," and is thanked for joining "Isle of Capri Casinos, Inc., or one of its affiliates or subsidiaries." The handbook also states "Your property may also have specific or more in-depth policies and procedures that will apply." *See also* Doc. #58-9 (acknowledging "there are property specific policies and procedures which are not contained in this Handbook that I must abide by as well and which have been presented to me separately.").

- IOC-KC's VP/GM sent a welcome letter to Plaintiff, informing her that training would encompass "a courtesy program for all team members within the Isle of Capri Casinos, Inc. company." Significantly, the letterhead contains IOC-KC's logo, and refers to the "Isle of Capri Casino in Kansas City."

- In 2016, IOC sent Plaintiff a letter about eligibility for FMLA and insurance benefits. Anthem Blue Cross and Blue Shield sent a COBRA coverage election notice to Plaintiff, identifying her employer as "Isle of Capri Casinos, Inc." Ameriflex sent a letter to Plaintiff seeking confirmation of eligibility for "Isle of Capri Casinos, Inc. COBRA group health plan(s)." Again, IOC offered many services, which included insurance benefits, to IOC-KC.

- In 2016, IOC-KC's Director of Human Resources emailed Plaintiff about attendance. Doc. #100-1. Her signature block contained the following: "© 2015 Isle of Capri Casinos, Inc. All Rights Reserved." However, the sender identified herself as "Director of Human Resources, Kansas City."

While there are many references to IOC in these documents, IOC, contrary to Plaintiff's representation, did not identify itself as Plaintiff's employer.

### (g) Strong Presumption Parent Company Is Not Employer

The Eighth Circuit has determined there is a "strong presumption that a parent company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances." *Brown v. Fred's, Inc.*, 494 F.3d 736, 739 (8th Cir. 2007) (citations omitted) (analyzing the parent/subsidiary relationship under a Title VII claim). The Eighth Circuit found a parent company employs its subsidiary's employees if "(a) the parent company so dominates the subsidiary's operations that the two are one entity and therefore one employer…or (b) the parent company is linked to the alleged discriminatory action because it controls "individual employment decisions." *Id.* (citation omitted). Analogously, Missouri courts have determined "two separate corporations are regarded as wholly distinct legal entities, even if one partly or wholly owns the other." *Diaz*, 484 S.W.3d at 82 (citation omitted). The Missouri Supreme Court "has admonished that parent/subsidiary separation should be ignored with caution, and only when the circumstances clearly justify it." *Doe 1631 v. Quest Diagnostics, Inc.*, 395 S.W.3d 8, 18 (Mo. 2013).

In *Brown*, the plaintiff provided evidence the parent company processed payroll and performed other services for its subsidiary in exchange for a fee. The plaintiff also demonstrated parent company's name appeared on the plaintiff's payroll check and other documents, including a handbook. *Brown*, 494 F.3d at 739-40. But the plaintiff did not set forth evidence suggesting the parent company and its subsidiary "were a single entity." *Id.* at 740. More specifically, the Eighth Circuit found there was insufficient evidence showing the parent company "actually controlled individual employment decisions" involving the plaintiff. *Id.* While the Court understands *Brown* was analyzed under Title VII, the FLSA, similar to Title VII, has an expansive definition of employer.

Individually, and in the aggregate, the factors discussed above establish IOC was not Plaintiff's employer and was not a joint employer with IOC-KC of Plaintiff. Considering the totality of the circumstances, the Court finds IOC did not have direct or indirect power to control significant aspects of Plaintiff's employment, and IOC did not act in the interest of IOC-KC in relation to Plaintiff. Accordingly, the Court grants IOC's motion for summary judgment on all of Plaintiff's FLSA and MMWL claims against IOC.

### (2) <u>Unjust Enrichment/Quantum Meruit Claims</u>

IOC also seeks summary judgment on Plaintiff's unjust enrichment/quantum meruit claims. To establish an unjust enrichment claim, Plaintiff must show (1) she conferred a benefit on IOC, (2) IOC appreciated the benefit, and (3) IOC accepted and retained the benefit under inequitable and/or unjust circumstances. *Binkley v. Am. Equity Mortg., Inc.*, 447 S.W.3d 194, 199 (Mo. Banc 2014). To prevail on a quantum meruit claim, Plaintiff must show (1) she provided services to IOC at IOC's request or with IOC's acquiescence, (2) the services provided were of a certain and reasonable value, and (3) IOC refused to pay for such services after Plaintiff demanded payment. *Moran v. Hubbartt*, 178 S.W.3d 604, 609 (Mo. Ct. App. 2005).

When responding to IOC's motion, Plaintiff, in a footnote, asked the Court to deny summary judgment on these claims for the same reasons the Court should deny summary judgment on Plaintiff's other claims. Doc. #99, at 95 n.4. Other than the arguments and evidence discussed above, Plaintiff did not establish she conferred a benefit on IOC, IOC appreciated the benefit, or IOC accepted and retained the benefits under inequitable or unjust circumstances. Also, Plaintiff did not show IOC requested (or acquiesced to) her services, her services were of a certain and reasonable value, she demanded payment from IOC, and IOC refused to pay her. Accordingly, Plaintiff has failed to set forth a prima facie case of unjust enrichment or quantum meruit. Thus, the Court grants IOC's motion for summary judgment on these claims.

## III.   DEFENDANTS' MOTIONS TO STRIKE DECLARATIONS

To support her Motion to Certify, Plaintiff submitted a declaration (Doc. #41-1), and also provided declarations executed by Brianne Stanford (Doc. #41-2), Joey Kendall (Doc. #41-4), and Chelsea Jaramillo (Doc. #61-1). Defendants moved to strike these declarations in their entirety because they are not based upon personal knowledge, lack foundation, and contradict deposition testimony. Docs. #46, 62, 67, 81.

## A.  Standard

Declarations must be based upon personal knowledge, set out facts that would be admissible in evidence, and show the declarant is competent to testify about the matters stated. *See Jain v. CVS Pharmacy, Inc.*, 779 F.3d 753, 758 (8th Cir. 2015) (finding the

district court did not err in striking a declaration because it was not based on personal knowledge); Fed. R. Civ. P. 56(c)(4); *see also O'Shaughnessy v. Cypress Media, L.L.C.*, 208 F. Supp. 3d 1064, 1067 (W.D. Mo. 2016); *Arvest Bank v. Elgin*, No. 6:14-CV-03287-SRB, 2015 WL 7431050, at *1 (W.D. Mo. Nov. 20, 2015). This is not surprising because, under the Federal Rules of Evidence, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. Declarations "asserting personal knowledge must include enough factual support to show that the [declarant] possesses that knowledge." *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 428-29 (8th Cir. 1995).

Generally, declarations contradicting the declarant's deposition testimony cannot be considered by the Court. *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 498 (8th Cir. 2008) (citation omitted). There are narrow circumstances in which a contradictory declaration may be considered: the declaration explains "certain aspects of the deposition testimony, or the prior testimony reflects confusion during the deposition or where the prior testimony reflects confusion on the part of the witness." *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1030-31 (8th Cir. 2000). But the declarations Defendants seek to strike were executed <u>before</u> the declarants were deposed, and therefore, the declarations did not explain deposition testimony or the declarant's confusion.

### B. Plaintiff's Declaration

Among other things, Plaintiff declares IOC had the power to hire and fire her, supervised and controlled her work schedule and employment conditions, had company-wide policies and practices, and failed to notify IOC employees of the FLSA tip credit requirements. Doc. #41-1, ¶¶ 5-15. Plaintiff only worked at IOC-KC, and does not establish she has personal knowledge of IOC's policies and procedures, particularly with regard to other subsidiaries. In fact, during her deposition, Plaintiff testified she did not know about policies or procedures applied to other IOC subsidiaries, did not know how IOC treated tips at other subsidiaries, and did not know if other IOC subsidiaries paid employees for training. Doc. #47-1, at 2, 4, 7, 12, 14-25, 27-28. When asked if she had "any knowledge about the facts and circumstances of any hourly employee at any other

Isle property outside of Kanas City," Plaintiff responded, "no." Doc. #47-1, at 12. Even so, because the Court has granted IOC's motion for summary judgment, Plaintiff's testimony about IOC is irrelevant.

Defendants also seek to strike the portions of Plaintiff's declaration that contradict her deposition testimony. By way of example, Plaintiff's declaration states "numerous other hourly employees were paid" pursuant to the same policies, practices, and and/or procedures. Doc. #41-1, ¶ 5. But during her deposition, Plaintiff admitted she did not know about employees other than those who worked as table games dealers and dual-rate supervisors. Doc. #47-1, at 28. The same is true of paragraphs six through fifteen in her declaration. Therein, contrary to her deposition testimony, Plaintiff declares she is knowledgeable about "hourly employees" at IOC.

Defendants also seek to strike the portions of Plaintiff's declaration that discuss positions other than table games dealer or dual-rate supervisor, the positions Plaintiff held. During her deposition, Plaintiff admitted she did not know if other positions at IOC-KC participated in the tip pool, did not know if other positions were subjected to rounding time, and did not know if other positions were required to report early for scheduled shifts. Doc. #47-1, at 3, 6-11, 25-26. Plaintiff admitted she only knew about her position and did not know what other hourly employees at IOC-KC did. *Id.* at 28.

Based upon the foregoing, the Court grants in part Defendants' motion to strike, and strikes the portions of paragraphs five through fifteen pertaining to IOC and/or IOC-KC hourly employees who did not hold the position of table games dealer or dual-rate supervisor. The Court denies in part Defendants' motion to strike, and will not strike the portions of paragraphs five through fifteen related to IOC-KC or IOC-KC employees who held the position of table games dealer or dual-rate supervisor.

### C. Declarations of Stanford, Kendall, and Jaramillo

Defendants move to strike the declarations of Stanford, Kendall, and Jaramillo, arguing they lack personal knowledge, and the declarations contradict their deposition testimonies. Stanford was an hourly employee at Isle Casino Hotel Waterloo located in Iowa. Doc. #41-2, ¶ 2. Kendall is in hourly employee at Lady Luck Casino Nemacolin located in Pennsylvania. Doc. #41-3, ¶ 2. Jaramillo was an hourly employee at Isle Casino Hotel Black Hawk and Lady Luck Casino Black Hawk, both located in Colorado.

Doc. #61-1, ¶¶ 2-3.  These individuals' declarations proclaim, among other things, IOC's hourly employees were paid pursuant to the same policies, practices, and procedures; IOC had the power to hire and fire "all other hourly employees"; IOC supervised and controlled the work schedules and employment conditions of "all other employees"; IOC determined the rate and method of pay for "all other hourly employees"; and timekeeping policies were the same at all IOC subsidiaries.  Doc. #41-2, ¶¶ 4-8, 10-18; Doc. #41-3, ¶¶ 4-6, 8-12; Doc. #61-1, ¶¶ 5-8, 13-17.

The purpose of these declarations, according to Plaintiff, was to demonstrate "putative class members were subject to common policies and procedures."  Doc. #64, at 3; Doc. #69, at 3; Doc. #83, at 3-4.  But each declarant testified during his or her deposition that he or she did not know anything about policies, procedures, and/or hourly employees outside the casinos in which they worked.[14]  Doc. #63-1, at 2-15; Doc. #68-1, at 2-5; Doc. #82-1, at 2-10.  Consequently, the portions of the declarations pertaining to IOC, employees at other casinos, and co-workers who did not work in the same position as declarant are not supported by personal knowledge, and are contrary to the declarants' deposition testimonies.  Defendants' motions to strike the portions of the declarations about casinos other than the ones in which they worked are granted.  Doc. #41-2, ¶¶ 4-8, 10-18; Doc. #41-3, ¶¶ 4-6, 8-12; Doc. #61-1, ¶¶ 5-8, 13-17.

With regard to the portions of the declarations that relate solely to the declarant and his or her personal experiences, the declarants have personal knowledge. Accordingly, the Court denies Defendants' motions to strike the portions of the declarations pertaining to the declarants' personal experiences.  However, evidence of other employees' experiences at other IOC subsidiaries is irrelevant given that the Court has granted IOC's summary judgment motion, and the declarants' employers are not parties to this matter.[15]

---

[14] Stanford, Kendall, and Jaramillo do not establish they have personal knowledge about IOC-KC's policies and procedures, and accordingly, cannot provide admissible evidence about any similarities between IOC-KC and the casinos in which they worked.
[15] Also, it is unlikely this Court would have personal jurisdiction over the other entities.

## IV.    PLAINTIFF'S MOTION FOR CONDITIONAL AND CLASS CERTIFICATION

### A.  Collective Actions

While she worked at IOC-KC, Plaintiff alleges she and others were not paid for all time worked due to a timekeeping policy that rounded time worked to the nearest quarter hour, even though the exact time clocked in and out was recorded.[16]  Plaintiff also contends IOC failed to comply with the FLSA tip credit notice requirements.  Plaintiff moves to conditionally certify two collective actions:

> Nationwide Timekeeping Policy Collective Action:  All hourly employees who worked at IOC or IOC's subsidiary properties or casinos in the United States at any time from three years prior to the filing of the Complaint, who clocked-in and clocked-out on an automated timeclock.

> Nationwide Tip Credit Notice Policy Collective Action:  All hourly employees who worked at IOC or IOC's subsidiary properties or casinos in the United States at any time from three years prior to the filing of the Complaint, and who were paid a direct hourly wage that was less than the federal minimum wage at that time.

Doc. #40, at 1-2.

### (1) Standard

The FLSA mandates an employer may not subject non-exempt employees to a workweek in excess of forty hours, unless the employee is compensated for his or her overtime with additional pay of at least one and one-half times his or her regular hourly wage.  29 U.S.C. § 207.  An action to recover overtime compensation and liquidated damages may be maintained, "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  An employee does not become a party to the suit "unless he gives his consent in writing to

---

[16] The Department of Labor regulates rounding practices:

> It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour.  Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work.  For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.

29 C.F.R. § 785.48.

become such a party and such consent is filed in the court in which such action is brought." *Id.* Under this FLSA framework, an employee's statute of limitations continues to run until his or her written consent to become a plaintiff to the action is filed with the court. 29 U.S.C. § 257.

The Eighth Circuit has not adopted a standard for evaluating conditional certification of a collective action, but many district courts in this circuit have used the analysis used by the Fifth Circuit. "Under this two step-process, the plaintiff first moves for class certification for notification purposes… At this early stage of litigation, the Court does not reach the merits of the plaintiff's claims. Once the Court conditionally certifies the class, potential class members are given notice and the opportunity to 'opt-in.'" *Kautsch v. Premier Commc'ns.*, 504 F. Supp. 2d 685, 688 (W.D. Mo. 2007) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995), *Grayson v. K Mart*, 79 F.3d 1086, 1096 (11th Cir. 1996), and *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 262 (S.D.N.Y. 1997)). "At the second step of the process, the defendant may move to decertify the class. This is typically done after the close of discovery when the Court has much more information and is able to make a more informed decision." *Id.*

Because the decision at this stage is made with limited information and is conditional, Plaintiff's burden is not onerous. There is no need to show would-be members are identical. It is sufficient if the plaintiff presents *some* evidence demonstrating the collective action members are similar in important respects, most notably by demonstrating they were subjected to similar policies or circumstances. *See Robertson v. LTS Mgmt. Servs. LLC*, 642 F. Supp. 2d 922, 926 (W.D. Mo. 2008); *Huang v. Gateway Hotel Holdings*, 248 F.R.D. 225, 227 (E.D. Mo. 2008); *Kautsch*, 504 F. Supp. 2d at 689; *Young v. Cerner Corp.*, 503 F. Supp. 2d 1226, 1229 (W.D. Mo. 2007).

## (2) Discussion

While her burden is not onerous at this stage, the Court finds Plaintiff has not demonstrated all hourly employees at all IOC subsidiaries are similar in important respects. Specifically, she has not shown all hourly employees at all IOC subsidiaries were subjected to similar policies or circumstances.[17] The same is true with regard to all

---

[17] Plaintiff's contention that IOC had "common" policies and procedures applied to all IOC subsidiaries is not only unsupported by the record, but is inconsequential to the Court's

table games dealers at all IOC subsidiaries.  *See Young*, 503 F. Supp. 2d at 1229 (finding mere allegations do not satisfy the requirements for conditional certification).

However, IOC-KC concedes Plaintiff has knowledge about the working conditions of IOC-KC table games dealers.  Doc. #50, at 9 (stating "Plaintiff's deposition testimony squarely confirms that she has no knowledge regarding the working conditions of any employees other than table games' [sic] dealers at IOC-KC.").  Table games dealers have the same job titles, have the same or similar responsibilities, and were treated similarly with regard to the timekeeping policy and tip credit notice policy.  *See Uwaeke v. Swope Cmty. Enters., Inc.*, No. 12-1415-CV-ODS, 2013 WL 3467062, at *2 (W.D. Mo. July 10, 2013) (stating it is unnecessary to show the would-be members are identical, and the plaintiff need only demonstrate the collective action members are similar in important respects).  Plaintiff has met her burden at this stage of the proceedings with regard to table games dealers at IOC-KC.  Now the Court must determine whether Plaintiff has presented some evidence demonstrating IOC-KC hourly employees, other than table games dealers, were subjected to the same policies.

With regard to IOC-KC's timekeeping policy, Plaintiff observed supervisors, waitresses, bartenders, beverage servers, cooks, and other hourly employees clocking in when she clocked in, and she believed (but did not know if) the timekeeping system rounded other employees' time.  Doc. #41-1, at 2; Doc. #50-1, at 6, 8-9, 25-26.  IOC-KC, in an interrogatory answer, represented "[t]ime clocks are used by all hourly employees to record their clock in/clock out times, positions worked, and total hours worked."  Doc. #41-13, at 8-9.  IOC's Corporate Payroll Director testified all IOC subsidiaries had the choice, and did in fact choose, to use the rounding function in the timekeeping system from 2013 through 2017.  Doc. #108-3, at 18-20; Doc. #109, at 68.[18]  The limited information presented to the Court indicates all hourly employees at IOC-KC were subjected to the same rounding policy.

_____

analysis due to its finding that IOC was not Plaintiff's employer.

[18] In responding to the Motion to Certify, IOC-KC argues there is no uniform timekeeping policy for its employees.  Doc. #50, at 12.  Instead of pointing to any IOC-KC timekeeping policies, IOC-KC points to another IOC subsidiary that utilizes at least fifteen timekeeping and attendance policies.  *Id.*  Setting aside the fact that IOC-KC does not address whether these different policies at the other subsidiary pertain to rounding, IOC-KC does not present any evidence that it had a different policy applying to other hourly employees that did not round time worked to the nearest quarter hour.

With regard to IOC-KC's tip notice policy, Plaintiff observed "food and beverage people," "dealers," "cashiers," and "slot people" receiving tips. Doc. #50-1, at 3. While she knew these employees did not participate in the same tip-splitting pool as table games dealers, she did not know if these employees participated in a different tip splitting pool. *Id.* Plaintiff also admitted she did not know what (if any) tip credit notice was given to other IOC-KC employees. Doc. #50-1, at 28-29. When asked to identify IOC-KC employees who were paid less than the state and/or federal minimum wage for hours worked, IOC-KC represented the following positions were "eligible for tips and for whom IOC-KC received a tip credit": barback/busser, bartender, bartender/lone wolf, beverage cart attendant, beverage server, busser/barback, cage cashier/window, dealer, food server - buffet, senior cage cashier, senior slot attendant, server/lone wolf, and slot attendant. Doc. #41-13, at 7-8. IOC-KC indicated 243 employees held those positions from August 17, 2013, through August 17, 2016. *Id.* As best the Court can tell, the employees who held the positions identified by IOC-KC were subjected to a similar tip policy. The Court assumes the list of relevant positions is all-inclusive, but to ensure all potential putative collective action members are notified, the Court, as set forth below, will not limit the notice to the positions identified by IOC-KC.

Based upon the foregoing, the Court conditionally certifies (1) a collective action consisting of IOC-KC hourly employees who clocked in and clocked out on an automated time clock or timekeeping system, and (2) a collective action consisting of IOC-KC hourly, tipped employees who were paid a direct hourly wage less than the federal or state minimum wage at the time they were paid.

The statute of limitations for an FLSA claim is two years, unless the employer acted willfully, in which case the limitations period is three years. 29 U.S.C. § 255. Whether IOC-KC violated the FLSA and whether the violations were willful relate to the merits of this matter. At this stage, the Court does not consider the merits. Rather, "[a]t this stage, justice is most readily served by notice reaching the largest number of potential plaintiffs." *Kautsch*, 504 F. Supp. 2d at 690 (citation omitted). Thus, the notice will assume a three-year statute of limitations.

In her Motion to Certify, Plaintiff asks the collective actions include alleged FLSA violations occurring three years prior to the filing of her Complaint. Doc. #41, at 1. Plaintiff filed this lawsuit in August 2016 (Doc. #1), but did not seek conditional or class

certification until November 2017 (Doc. #41).  In April 2018, the Court tolled the statute of
limitations for putative collective or class action members from February 20, 2018, until a
decision was issued on IOC's summary judgment motion.  Doc. #84, at 4-5.  Plaintiff will
be permitted to notify putative collective action members who worked for IOC-KC any
time from three years prior to February 20, 2018.

### (3) Class Representative and Class Counsel

Plaintiff asks to be appointed as class representative for both collective actions.
IOC-KC argues Plaintiff is not an adequate representative because her claims are not
typical or common to the rest of the class.  Doc. #50, at 19.  The Court overrules IOC-
KC's objection, and appoints her as class representative.  McClelland Law Firm asks the
Court to appoint it as counsel for the collective actions.  IOC-KC raises no objection to
this request.  The Court appoints McClelland Law Firm as class counsel.

### (4) Form and Manner of Notice

Once a collective action has been conditionally certified, the plaintiff may proceed
to notify putative collective action members of the right to "opt in" and participate in this
matter.  Plaintiff requests information on potential opt-in plaintiffs from IOC-KC, proposes
a notice plan dictating how she seeks to reach potential opt-in plaintiffs, and provides a
proposed.  Defendant did not object to Plaintiff's proposed form and manner of notice.

Defendant shall have twenty-one days from the date of this Order to provide
Plaintiff with a computer readable data file containing the full name, last known address,
last known email address, and dates of employment of all potential collective action
members.  The data file must also show whether and when IOC-KC claimed a tip credit
for each employee, and if IOC-KC claimed a tip credit for the employee, list the base sub-
minimum wage rate for each person, and the dates the person earned the base sub-
minimum wage.  To the extent IOC-KC requires more time to review personnel records to
locate information not electronically stored, the parties shall confer in accordance with
Local Rule 37.1 to mutually agree on a short extension of time.  The Court denies
Plaintiff's request for the last four digits of employees' social security numbers because
she has not persuaded the Court that this information is necessary.

The notice period in which individuals may opt-in shall run for ninety days from the date of this Order. Plaintiff shall send, via first-class mail and email,[19] the approved notice and consent form to potential opt-in collective action members. IOC-KC shall post the approved notice in conspicuous locations where potential collective action members will see the notice (e.g., time punch clock, break room bulletin board, job notices bulletin board), and the notices shall remain posted during the opt-in period. Plaintiff may send no more than a total of two additional reminder notices, via first class mail and/or email, to each potential opt-in collective action member thirty days prior to the running of the notice period. Executed consent forms shall be filed by no later than one hundred days after the date of this Order.

The Court approves the proposed notice (Doc. #41-20) with these modifications:

- This matter shall be identified as *Larson v. IOC-Kansas City, Inc.* (not *Larson v. Isle of Capri Casinos, Inc., et al.*).

- The phrase "if you worked at Isle of Capri Casinos, Inc., or one of its subsidiary casinos (below)" shall be changed to "if you worked at IOC-Kansas City, Inc."

- The list of IOC subsidiaries must be removed.

- The phrase "an employee has sued Isle of Capri Casinos, Inc. ("IOC")" shall be changed to "an employee has sued IOC-Kansas City, Inc."

- The phrase "who worked at IOC or one of its subsidiary casinos in the United States" shall be replaced with "who worked at IOC-Kansas City, Inc."

- The phrase "IOC and its subsidiary casinos" shall be changed to "IOC-Kansas City, Inc."

- All references to IOC, Isle of Capri Casinos, Inc., or IOC's subsidiaries shall be removed from the notice. The notice shall only refer to IOC-Kansas City, Inc.

- The references to "DATE" on the first page shall be February 20, 2018.

- The "CONSENT DUE DATE" should reflect 90 days from the date of this Order.

- In the Consent to Join form, Isle of Capri Casinos, Inc. shall not appear in the caption or anywhere else on the form. Only IOC-Kansas City, Inc. shall be identified as Defendant. All references to "Defendants" shall be changed to "Defendant." The "Named Plaintiffs" shall be changed to "Cynthia D. Larson," and all references to her in the form must be changed from plural to singular.

---

[19] This assumes Plaintiff receives a physical mailing address and email address for each putative class member. If either address is unknown, inaccurate, or unusable, Plaintiff shall send the notice and consent form to whatever valid address (physical or email) she has. If notices are returned, IOC-KC's counsel is expected to work with Plaintiff's counsel to ensure comprehensive distribution of the notice in a timely fashion.

## B. Class Action

Plaintiff seeks certification of an Unjust Enrichment Class, identified as all IOC-KC hourly employees who worked "at any time from five years prior to the filing of the Complaint, who clocked-in and clocked-out on an automated timeclock." Doc. #40, at 2; Doc. #41, at 23. To maintain a class action, Plaintiff must satisfy the four prerequisites set forth in Rule 23(a) of the Federal Rules of Civil Procedure:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Upon satisfying the prerequisites, Plaintiff must demonstrate her case qualifies under one of the three subparts of Rule 23(b) of the Federal Rules of Civil Procedure. *Janson v. LegalZoom.com, Inc.*, 271 F.R.D. 506, 509 (W.D. Mo. 2010). In determining whether to certify a class, "a court must conduct a limited preliminary inquiry, looking behind the pleadings…. [H]owever, the court must look only so far as to determine whether, given the factual setting of the case, if the plaintiffs general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005). The certification decision is a matter of discretion. *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013). In the interest of brevity, the Court will assume, for the sake of argument, the Rule 23(a) requirements are satisfied.

Plaintiff invokes Rule 23(b)(3), which permits certification if common questions of law or fact "predominate over any questions affecting only individual members," and a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Plaintiff argues a class action is superior because (1) the amount of damages is low, particularly when compared to the cost of individual litigation; (2) there are no pending actions in Missouri against IOC-KC regarding its timekeeping policy; (3) this forum is desirable because IOC-KC is located in Missouri; and (4) "the case does not pose significant management issues given that common proof will be used to support Plaintiff's claims related to [the] timekeeping policy." Doc. #41, at 27.

It is unclear (and unestablished) why a class action would be superior when an FLSA collective action has been conditionally certified, and the collective action appears to seek the same relief (and Plaintiff cannot recover double damages for the same injury). Doc. #41, at 26-27; *See Fry v. Accent Mktg. Servs., L.L.C.*, No. 4:13CV59, 2013 WL 2403669, at *2 (E.D. Mo. May 31, 2013) (citation omitted). Although not discussed in her motion, Plaintiff seems to suggest (with the scope of her proposed class) the statute of limitations is lengthier for unjust enrichment claims than the statute of limitations is for FLSA claims. Perhaps that is why Plaintiff wishes to certify a class action for unjust enrichment. In Missouri, "[a]ll actions upon contracts, obligations or liabilities…except where a different time is herein limited" shall be brought within five years. Mo. Rev. Stat. § 516.210(1) (2016). But section 516.140 states the following:

> An action by an employee for the payment of unpaid minimum wages, unpaid overtime compensation or liquidated damages by reason of the nonpayment of minimum wages or overtime compensation, and for the recovery of any amount under and by virtue of the provisions of the Fair Labor Standards Act of 1938 and amendments thereto, such act being an act of Congress, shall be brought within two years after the cause accrued.

Mo. Rev. Stat. § 516.140 (2014). The MMWL also mandates "[a]ll actions for collection of any deficiency in wages shall be commenced within two years of the accrual of the cause of action." Mo. Rev. Stat. § 290.527 (2016). The Eastern District of Missouri has determined the two-year statute of limitations applies to all claims (not just MMWL claims) for unpaid minimum wages and unpaid overtime compensation. *See Tinsley v. Covenant Care Servs., LLC*, No. 1:14CV00026, 2016 WL 393577, at *5 (E.D. Mo. Feb. 2, 2016); *Davenport v. Charter Commc'ns, LLC*, No. 4:12CV00007, 2012 WL 5050580, at *4 (E.D. Mo. Oct. 18, 2012); *Sutton-Price v. Daugherty Sys., Inc.*, No. 4:11-CV-1943, 2012 WL 2282344, at *2 (E.D. Mo. June 18, 2012); *but see Nobles v. State Farm Mut. Auto. Ins. Co.*, No. 2:10-CV-4175-NKL, 2011 WL 5563444, at *2 (W.D. Mo. Nov. 15, 2011) (holding an unjust enrichment claim for "straight wages" was "not a claim falling under Missouri minimum wage or overtime law, but instead has its basis in general contract law," and therefore, the Court applied the five-year statute of limitations).

Plaintiff has not established her unjust enrichment claim seeks relief for injuries other than those she suffered as a result of IOC-KC's alleged FLSA violations. Further, she has not alleged her unjust enrichment claim is based upon general contract law (or

other law) that would permit the Court to apply a different statute of limitations. As such, the Court finds the two-year statute of limitations applies to Plaintiff's unjust enrichment claim. Consequently, if the Court were to certify the proposed class, the conditionally certified collective action and class action would be duplicative, and although not discussed by Plaintiff, would result in double recovery for the same injuries. It is one thing for a single plaintiff to assert alternative theories. It is another to certify a separate class action duplicative of a conditionally certified collective action. Accordingly, a class action is not superior, and the Court denies Plaintiff's motion to certify a class action.

## V.    CONCLUSION

For the foregoing reasons, IOC's Motion for Summary Judgment is granted with regard to all of Plaintiff's claims against IOC. In addition, Defendants' Motions to Strike are granted in part and denied in part. Plaintiff's motion to conditionally certify collective actions is granted in part and denied in part, and Plaintiff's motion to certify a class action is denied. Finally, pursuant the Interim Scheduling Order (Doc. #23), the parties shall submit a joint proposed scheduling order within twenty-one days of the date of this Order.[20]

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE:  December 10, 2018                    UNITED STATES DISTRICT COURT

---

[20] The parties are reminded of the requirements for the joint proposed scheduling order:

> The Proposed Plan must comply with Local Rules 16 and 26. Plaintiff's counsel shall take the lead in preparing the Proposed Plan. In preparing the Proposed Plan, the parties should review Local Rule 16.1(f) as well as "Procedures for Proposed Scheduling Orders" located on the Court's website at www.mow.uscourts.gov/judges/smith.html, which set forth what information must be included in the parties' Proposed Plan. Additionally, pursuant to Rule 26(f)(3)(C), the proposed plan should address any concerns or issues relating to electronically stored information….

Doc. #13, at 1-2.